Merrimack
No. 2005-652

JOHN BOYNTON & a.

v.

DENNIS FIGUEROA & a.

Argued: October 3, 2006
Opinion Issued: December 21, 2006

*Bernstein, Shur, Sawyer & Nelson,* of Manchester (*Andru H. Volinsky* on the brief and orally), for the plaintiffs.

*Edward D. Philpot, Jr., PLLC,* of Laconia (*Edward D. Philpot, Jr.* on the brief and orally), for defendant Signature Building Systems, Inc.

DALIANIS, J. Defendant Signature Building Systems, Inc. (Signature) appeals the jury verdict entered in Superior Court (*McGuire,* J.) awarding the plaintiffs, John and Alicia Boynton, $250,000 in damages and assigning Signature 90% of the fault for the negligent construction and installation of their home. We affirm.

The jury could have found the following facts. Signature is a manufacturer of factory-built modular homes. Rather than sell its homes directly to consumers, Signature maintains a network of approved builders

from whom its homes may be purchased. Upon receiving an order from one of its builders, Signature builds the home in its Pennsylvania plant and delivers it to the building site; one of its approved builders then erects the home on the site and finishes it there.

The plaintiffs learned about Signature's modular homes through an acquaintance, defendant Dennis Figueroa. Figueroa was one of Signature's approved builders. He worked with his father, who was the exclusive dealer for Signature homes in New Hampshire.

Figueroa provided the plaintiffs with brochures about Signature homes, which stated that: the plaintiffs could expect to move into a new modular home in "3 to 4 weeks after delivery"; Signature homes are "top-quality" and "custom built"; Signature uses "only the best quality products" in constructing its homes; "[q]uality will be consistent throughout the home"; Signature "goes to extraordinary lengths to provide top quality construction"; the "customized styling, affordable pricing and structural integrity" of a Signature home is "unmatched in a 'site-built' home"; Signature "sell[s] our homes through a trusted team of building professionals trained in the intricacies of construction and detailed finish work"; and, "[i]f problems should arise, we have a fully trained staff of field professionals capable of performing any task quickly and efficiently."

Before buying a Signature home, the plaintiffs investigated other modular home manufacturers. They eventually chose Signature because of the representations made in its marketing materials with respect to the quality of its homes and the builders with whom it works. As Alicia Boynton testified, "One of the things that helped us decide was all the literature that we were handed and all the information I could find on the internet."

The plaintiffs purchased their Signature home on June 12, 2003. The total price for the home, a two-car garage, deck and pool, was $214,400. Of this amount, $69,000 was paid directly to Signature for the modular home itself. The remainder, $145,000, was for the two-car garage, deck and pool and the services of Figueroa and his subcontractors.

Under the purchase and sale agreement, the plaintiffs were responsible for the "proper setting of the modular units on to the foundation," as well as "the proper installation of doors, siding, trim, and the tightening or adjustment of plumbing fitting that may loosen during shipment, as well as other items that must be shipped loose." The plaintiffs entered into a separate agreement with Figueroa to complete this work. Figueroa agreed to "furnish all of the materials and perform all of the work utilizing appropriate Signature Building Systems Modular construction and other sub-contractors as needed." The contract originally specified that the work

would be substantially completed by September 1, 2003. This date was later changed to October 15, 2003.

Anticipating that they would move into their new modular home soon after purchasing it, the plaintiffs sold their former home in August 2003. Until their modular home was ready, they lived with their two teenage children and two dogs in a small camper. The plaintiffs were unable to move into their new home until January 2004.

The plaintiffs noticed problems with the foundation before the modular home was set on it. They noted, for instance, that Figueroa had not sited their home where they had directed him to site it. When they confronted him about this, he told them not to worry and that their home would be sited where they wanted it. Figueroa's assurance notwithstanding, the home was not sited where they wanted it to be, so the plaintiffs were unable to have a pool in their backyard and to have their two-car garage, as planned.

Shortly after the foundation was poured, the plaintiffs also noticed that one of its walls was cracked and "had to be removed and a section of [it] re-poured." The plaintiffs also observed that when Figueroa re-poured the new section of concrete, he created a patch that did not continue below the grade, even though the foundation continued below the grade.

The plaintiffs further observed that a bulldozer blade had hit the foundation, leaving a "big chunk" of it missing. When John Boynton asked Figueroa about how this would be fixed, Figueroa responded: "[W]e're just going to stuff it full of insulation and then re-Tyvac it and put siding over it." Mr. Boynton told Figueroa that he needed to "fix it the right way and cut out the bad plywood, put some more insulation in and then . . . put in a patch of plywood and . . . Tyvac it and side it." Because Figueroa never fixed this problem, Mr. Boynton did it himself.

The modular home was set on its foundation at the end of September 2003. After it was set, the plaintiffs noticed that the aluminum fascia boards, underneath the shingles, were "dinged-up." They also noticed that the closet walls sagged. When the plaintiffs asked Figueroa about the sagging closet walls, he told them that it was "just an optical illusion." The plaintiffs believed that the sagging walls indicated that the roof was pushing down on them.

Because of the problems the plaintiffs observed, and Figueroa's inadequate responses when confronted about them, the plaintiffs fired him on November 17, 2003. The "last straw" for the plaintiffs concerned the setting of their gravity-fed septic tank. Figueroa set the septic tank higher than the opening coming from the house, which meant that the effluent would not go into the tank, but would stay in the house. As of the date they

fired him, the plaintiffs had paid approximately $129,000 for their new home and for the services of Figueroa and his subcontractors.

A few days after the plaintiffs fired Figueroa, Jay Bradley, an area sales manager for Signature, came to their property to drop off some materials. Ms. Boynton took Bradley through the home and explained "all the things that we, as homeowners, thought were wrong, the issues that we had brought forward to our contractor that were never resolved." At the same time, she asked him what she and her husband could do to "fix things or if the things that we had done were fixed right and, if not, how to remedy what we did."

Ms. Boynton showed Bradley problems with the roof, vent pipes, siding, dormers, weather-proofing and windows. Specifically, she showed him that: (1) the roof lacked shingles in places and did not "line up properly"; (2) she and her husband had replaced sagging beams in the closets because they were concerned the roof was caving in; (3) the vent pipes were too small; (4) the entrance to the basement did not have siding on it; (5) one of the dormers was not properly connected to the roof; (6) there was damaged "step flashing" between another dormer and the roof; (7) there was no tar over certain exposed nails and screws; (8) one of the home's windows was missing a piece that made the window "weather-tight"; and (9) some of the windows were incorrectly installed and, thus, also were not "weather-tight."

Ms. Boynton also informed Bradley that the foundation was not level, which he confirmed. While touring the home, Bradley determined that the "sill plate," pressure-treated wood that is bolted or strapped to the foundation upon which the home is then set, was not level.

Because Ms. Boynton had been told that Signature only worked through authorized dealers and did not service customers directly, she asked Bradley to put her in contact with another Signature dealer. He did not do so.

Ms. Boynton also requested that Bradley send her a copy of the "set manual" for the home. The set manual "tells you everything you need to know, how [the home] was constructed, how the roof system works[,] ... what your lot should be like, what your foundation should be like." Although she requested the manual in November 2003, she did not receive it until January 2004.

From the set manual, the plaintiffs learned that the "lally columns" in the basement were supposed to be secured to the beams and to the floor. The lally columns in the plaintiffs' home were not secured. To fix this problem, Mr. Boynton "took a jack and we jacked the house up so [that all of the floor joists] had the same measurement, and then we .... added steel plates until I made it level."

The plaintiffs also learned that the "mating walls" of the house were supposed to be tied together with factory-supplied square galvanized plates. Ms. Boynton testified that "[t]here [were] gaps in all of the mating walls within [the] house." In trying to fix this problem, the plaintiffs discovered that "the walls were too far apart because of the gaps." Therefore, they "had to suck the walls in with [C] clamps" and lag bolts.

After the plaintiffs moved into the house, they discovered that it "would only get up to 55 degrees, no matter what you put the thermostat on, and [that] ... the windows [were] drafty." To remedy this problem, the plaintiffs insulated the second floor and, for the winter of 2005, had the windows shrink-wrapped.

The plaintiffs also noticed problems with their driveway. As Ms. Boynton testified, "It was a mud bog. You would sink in the mud up over your ankles if you walked up through." As a result of this problem, the plaintiffs "hired someone to ... take out the first few layers of top soil ... and ... put in hard pack and stone." Additionally, to fix other problems, the plaintiffs had: (1) a new septic system designed and installed; (2) a foundation drain installed; and (3) the well excavated and rocks and debris removed from it.

The plaintiffs also attempted to make the house level. Mr. Boynton explained that they "jacked the backside of the house[,] ... where the cracked foundation was." Using six-by-six pressure treated beams, the plaintiffs "tried to work the jacks as even as we could and a little bit at a time, ... going from one jack to the other." Mr. Boynton then put a shim in between the mudsill and home to make the home level.

The plaintiffs spent $53,000 to remedy the problems they observed. They were anxious to get the house completed because they were "homeless, living in a trailer." Additionally, Ms. Boynton testified that her lost wages for the time spent fixing the home were approximately $2,700. She testified that Mr. Boynton's lost wages were approximately $380. Ms. Boynton also testified that, because their garage was never built, they had paid $85 per month for two storage units, for a total of $1,785.

The plaintiffs' expert testified that the quality of the work done in installing their modular home was "very poor." The standard of care by which the plaintiffs' expert measured Signature was the standard of a custom home, because of Signature's representations in its marketing materials. In his opinion, the plaintiffs' home did not "even meet the minimum building code standards in a number of respects."

The plaintiffs' expert opined that, in his professional judgment, there was no way to remedy the home's problems completely. He testified that "if the home is going to meet the standard of habitability, thermal integrity, structural firmness that was intended and promised," then it was

necessary to remove the house "down to the foundation to get the custom home" the plaintiffs wanted and had been promised. As he testified: "If [the home] were to be brought to the standard that was represented at this point, I believe you should take it down and crush it like my 17-year-old's old car and put new boxes on a very carefully leveled, shimmed, anchored mudsill as meets . . . the code."

In April 2004, the plaintiffs sued Signature for, among other things, negligence, negligent and intentional misrepresentation, and for a violation of the New Hampshire Consumer Protection Act (CPA), *see* RSA ch. 358-A (1995 & Supp. 2006). Following a four-day trial, which included a view, the jury returned a verdict in favor of the plaintiffs. Signature moved for judgment notwithstanding the verdict (JNOV), to set aside the verdict, and for remittitur; the trial court denied all three motions. Over Signature's objection, the trial court doubled the jury verdict of $250,000 based upon the jury's finding that Signature acted willfully when it violated the CPA.

The plaintiffs requested that the court either attach property belonging to Signature or require it to post a bond sufficient to cover the damages award. The trial court granted this request, ruling that a bond was warranted because Signature had "not demonstrated or even represented[] that it will be able to satisfy the judgment."

On appeal, Signature argues that the trial court erred when it: (1) denied Signature's motions *in limine* to prohibit the plaintiffs from testifying about their remediation efforts and the costs thereof; (2) permitted the plaintiffs to offer their lay opinions about the alleged defects in the home and the means necessary to repair those defects; (3) denied Signature's motions for JNOV and for remittitur; and (4) ordered Signature to post a bond.

I

Signature argues that the trial court erred when it permitted the plaintiffs to testify about the existence of the alleged defects in the home, efforts they undertook to remedy those defects, the need for those efforts, the cost of their remedial efforts and the reasonableness of those costs. Signature asserts that these subjects required "specialized expertise and thus expert testimony." Signature also contends that the plaintiffs' testimony was not based upon their own observations, but rather upon information they received from "undisclosed third[-]party experts."

We first address whether the trial court erred when it permitted the plaintiffs to testify about the home's defects, their remedial efforts and the costs of those efforts. We review a trial court's decisions on the admissibility of evidence under an unsustainable exercise of discretion

standard. *Desclos v. S.N.H. Med. Ctr.*, 153 N.H. 607, 610 (2006). We will not disturb the trial court's decision absent an unsustainable exercise of discretion. *Id.*

New Hampshire Rule of Evidence 701 permits a lay witness to give an opinion provided that it is rationally based upon the witness's perception and is helpful to a determination of a fact issue. *Transmedia Restaurant Co. v. Devereaux*, 149 N.H. 454, 460 (2003). Signature contends that the plaintiffs' testimony was impermissible lay opinion testimony because it was not rationally based upon their perceptions.

The record reveals that, contrary to Signature's assertions, the plaintiffs merely testified about their observations and their personal actions. Ms. Boynton testified, for instance, that she could see daylight coming through a crack between one of the home's dormers and the roof. Where there was supposed to be flashing, she saw roof paper. She testified that she could see that there was a gap between the two halves of the home's roof, and that she knew that there were problems with the driveway because her "shoes stuck in [the mud] several times." She testified that she knew that she and her husband spent $53,000 on their remediation efforts because she "ha[s] the receipts and [the] cancelled checks that [she] paid the money out of"; she personally wrote the checks.

Similarly, Mr. Boynton testified that he saw that the top of the septic tank "was at the same height as the sill of the house." He testified that the aluminum fascia boards were "dinged up." Mr. Boynton also testified that he and his wife saw that the top part of a closet wall when first installed "was straight" and after a week they "saw sags." He testified that he concluded that this meant that the roof was pushing down on the wall based upon his observation of the wall. He also saw "with [his] own eyes" that factory-installed kneewalls had begun "bowing out."

Mr. Boynton testified about the remediation efforts that he personally took. For instance, to remedy the problem with the closet wall, he used "a couple of 20-ton bottle jacks, which [are] hydraulic jack[s]" and his own "screw jacks." He described the process as follows:

> With the jacks, everything in place, ready to go. We would undo the collar tie. We had a string across. We took 1 ½ block and went from one end of the house to the other along this rafter line, and we took a measure from that string to the rafter to make sure they were all the same all the way across as we were jacking .... Once, like I said, we removed the collar tie, we would get it to where the measurement was, re-nail the collar tie, and then we would reconstruct the tops of the closet walls with that solid header, which is one of the pictures. Well, as you seen when you

were at the site, it's solid now, there's not openings with 2 by 4's, and then we would make sure that wall is secure, and then we worked our way down.

Similarly, to make the lally columns fit better, Mr. Boynton testified:

> There again, we ran a string across. We took measurements from the floor joists down to the string. I think it was floor joists. I can't remember exactly where I measured it to, but we took a jack and we jacked the house up so they all had the same measurement, and then we filled in. I had to end up cutting. That's why those big, thicker plates are there. I just used what I had. I went to my family's house . . . and got the heavy steel, and I took my torch and cut them into pieces, and then I added the steel plates until I made it level.

■ The crux of Signature's objection to the plaintiffs' testimony goes to its weight, not its admissibility. It was the jury's function to weigh the evidence. *See id.* at 461. As the plaintiffs' testimony was rationally based upon their own perceptions, we hold that the trial court did not err by admitting it.

■ We next address Signature's contention that expert testimony was required. Expert testimony is required where the subject presented is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson. *Carbone v. Tierney*, 151 N.H. 521, 527 (2004). Expert testimony is not required where the subject presented is within the realm of common knowledge and everyday experience. *Id.*

■ We disagree with Signature that the plaintiffs were required to provide expert testimony to prove the existence of the alleged defects in the home and the reasonableness of costs to repair them. The types of defects at issue were not so far beyond the ken of the average layperson as to require expert testimony; they were defects that the plaintiffs observed themselves and, to the extent that they were not remedied, could be observed by the jury when it took its view. Moreover, the plaintiffs testified as to the expenses they have already incurred to remedy the defects they observed. As they note in their brief, "the remedial work in question here has already been completed, obviating the need for detailed expert projections of what damage award would be necessary to cover prospective construction costs."

## II

Signature next asserts that the trial court erred when it failed to grant Signature's motion for JNOV upon the plaintiffs' negligence claims. The plaintiffs alleged two negligence claims against Signature. The first concerned Signature's allegedly negligent construction of their modular home. The second concerned Signature's alleged negligence in selecting, training and/or supervising Figueroa. The plaintiffs also alleged that Signature was responsible, as the principal, for the negligence of its apparent agent, Figueroa. Signature contends that it was entitled to JNOV upon these claims because the plaintiffs' attempted remediation was either a superseding cause that terminated Signature's liability or was evidence of their contributory negligence. Signature also implies that because Figueroa was an independent builder, Signature was not responsible for his negligence.

Signature argues that it was also entitled to JNOV upon the plaintiffs' negligent misrepresentation and CPA claims because they failed to prove that they relied upon Signature's statements about the qualifications of its builders. Signature further contends that it was entitled to JNOV upon the plaintiffs' CPA claim because the plaintiffs failed to establish that Signature's ads were deceptive.

■ A party is entitled to JNOV only when the sole reasonable inference that may be drawn from the evidence, which must be viewed in the light most favorable to the nonmoving party, is so overwhelmingly in favor of the moving party that no contrary verdict could stand. *Id.* at 529. In deciding whether to grant the motion, the trial court cannot weigh the evidence or inquire into the credibility of witnesses. *Id.* If the evidence adduced at trial is conflicting, or if several reasonable inferences may be drawn, the court must deny the motion. *Id.* Our standard of review of a trial court's denial of a motion for JNOV is extremely narrow. *Id.* We will not overturn the trial court's decision absent an unsustainable exercise of discretion. *Id.*

### A

We first examine whether the trial court erred when it ruled that the jury reasonably could have found, viewing the evidence in the light most favorable to the plaintiffs, that the plaintiffs' efforts to remedy the problems with their home were neither a superseding cause nor evidence of contributory negligence.

■ Generally, an independent intervening cause will not interfere with the connection between the original act and the injury if the intervention

was probable or foreseeable. *Marcotte v. Timberlane/Hampstead School Dist.*, 143 N.H. 331, 348 (1999). Here, there was evidence from which the jury reasonably could have found that the plaintiffs' remediation efforts were probable or foreseeable. The plaintiffs testified that they asked Figueroa to fix various problems with the home and that he never did so. They also testified that they asked Signature to refer them to another approved builder, and that Signature did not do so. They further testified that until they were able to move into their home, they lived with their teenage children and dogs in a small camper. From this testimony, viewed in the light most favorable to the plaintiffs, the jury could have reasonably found that it was foreseeable that the plaintiffs would attempt to remedy the home's problems to make it habitable, rather than continue to live in a camper.

There was also evidence from which a reasonable jury could have found that the plaintiffs were not contributorily negligent. The plaintiffs' expert testified, for instance, that the home was improperly set on its foundation in the first instance. He testified that "once you've lost the opportunity to get it right, it's very hard to turn the clock back, and I think more so with a modular home than with a conventional-type construction." He testified that because the home was improperly set, it was "racked," which he explained as follows: "When a cube, a cube shape is placed on a foundation that's not level from one corner to another, the floor takes the form of a hyperbolic parabola, a warped plane. It takes the walls and it racks them into parallelograms, to the extent that it's out of level." Accordingly, he testified that for the home to meet the standards promised, it would have to be removed down to its foundation. Signature's president testified as well that "[t]here is no question" that a "modular home is really only as good as the foundation it's set on." If the foundation is out of level, "[i]t magnifies or amplifies right up straight through" the home.

█ From this testimony, viewed in the light most favorable to the plaintiffs, the jury reasonably could have found that any harm to the plaintiffs was complete before they undertook any remedial actions and that any of their remedial actions did not exacerbate their harm. We therefore conclude that the trial court did not err when it denied Signature's motion for JNOV on this ground.

We next examine whether the trial court erred when it ruled that the jury reasonably could have found, viewing the evidence in the light most favorable to the plaintiffs, that Signature was responsible for Figueroa's negligence. With respect to the plaintiffs' negligence claims, the jury was instructed, without objection by Signature, that the plaintiffs had alleged that Figueroa had apparent authority to act on Signature's behalf and that

Signature was therefore bound by Figueroa's acts. We interpret this as an instruction that the jury could find Signature to be vicariously liable for Figueroa's negligence if it found that Figueroa had apparent authority to act on Signature's behalf and was, thus, Signature's agent. *See VanDeMark v. McDonald's Corp.*, 153 N.H. 753, 760-61 (2006).

■■ To the extent that Signature now argues that the jury could not have reasonably found that Figueroa had apparent authority to act on its behalf, we disagree. Whether an agency relationship has been established is a question of fact. *Id.* The necessary factual elements to establish agency involve: (1) authorization from the principal that the agent shall act for him or her; (2) the agent's consent to so act; and (3) the understanding that the principal is to exert some control over the agent's actions. *Id.* Authority to act can be actual or apparent. *See State v. Zeta Chi Fraternity*, 142 N.H. 16, 22, *cert. denied*, 522 U.S. 995 (1997). "Apparent authority . . . exists where the principal so conducts itself as to cause a third party to reasonably believe that the agent is authorized to act." *Id.* (quotation and brackets omitted).

There was evidence in the record from which a reasonable jury could have found that Figueroa had apparent authority to act on Signature's behalf. For instance, Signature's brochures stated that Signature homes are sold "through a trusted team of building professionals." There was also testimony that Signature has a "co-op advertising" program through which it pays its builders to place approved ads containing Signature's logo and the builder's own logo. Figueroa's father testified that he was part of this advertising program, which permitted him to use Signature's logo and name in any of his promotions, advertising and distribution of marketing materials.

Moreover, Figueroa and the plaintiffs signed various agreements that described his relationship with Signature. For instance, Figueroa and the plaintiffs signed an order form, on Signature letterhead, in which he agreed to sell a Signature home to the plaintiffs. Further, an exhibit entitled, **"PURCHASE OF YOUR FACTORY DIRECT MODULAR HOME,"** signed by Figueroa and the plaintiffs, stated that: (1) the signatories to the agreement acknowledged that the plaintiffs were purchasing a Signature modular home through a Signature dealer (Figueroa's father's company); (2) all orders for a Signature home "shall be in writing and processed through the Dealer and shall be subject to acceptance by the Manufacturer"; (3) all deposits and payments must be in cash or in a check issued to the Signature dealer; (4) delivery of the home is to be completed within sixty days, but may be extended "through the Dealer by mutual agreement of Manufacturer and Buyer"; (5) "[t]he

Dealer is responsible for handling the administrative functions required for the Buyer and for coordinating and servicing the house with the Manufacturer in a satisfactory manner." In the separate contractor agreement between Figueroa and the plaintiffs, Figueroa agreed to "perform all of the work utilizing appropriate Signature Building Systems Modular construction." Further, although the agreement between Signature and the company owned by Figueroa's father stated that there was no agency relationship between the two, this language did not appear in any of the agreements the plaintiffs signed.

■ Viewing all of the above evidence in the light most favorable to the plaintiffs, we hold that a reasonable jury could have concluded that Figueroa had apparent authority to act on Signature's behalf. Accordingly, the trial court did not err when it denied Signature's motion for JNOV on this basis.

B

■ We next address whether the trial court erred when it ruled that the jury reasonably could have found, viewing the evidence in the light most favorable to the plaintiffs, that they relied upon Signature's statements about the qualifications of their builders. As there was evidence in the record from which a reasonable juror could have found that the plaintiffs relied upon Signature's statements, we conclude that the trial court did not err when it denied Signature's motion for JNOV on this basis. Mr. Boynton specifically testified that he and his wife "rel[ied] on [Signature's] representations about . . . the quality of the product in deciding to go with the Signature home" and "about [the] quality of [its] builders in deciding to go with Signature and . . . Figueroa." In addition, Ms. Boynton testified that the company's literature and the information it provided on its website helped the plaintiffs decide to purchase a Signature home.

■ We next examine whether the jury reasonably could have found that Signature's statements about its builders were deceptive. Signature's marketing materials referred to its builders as "a trusted team of building professionals trained in the intricacies of construction and detailed finish work." There was evidence, however, that a builder need not have had any prior modular home construction experience to become part of Signature's "trusted team of building professionals." Nor did a builder need any "minimum building experience" to become a Signature builder. Indeed, at trial, Bradley testified that although he was the sales manager responsible for Figueroa's area at the time, he did not take any steps to determine whether Figueroa was a competent builder. Figueroa's father confirmed

that when he became a Signature builder, he had never built modular homes before. He became an approved Signature builder based upon a "casual conversation" with Bradley. Signature approved Figueroa's father without asking him for bank or trade references and without knowing that his prior business ended in bankruptcy. And, Signature did not revoke its approval of Figueroa's father as a builder even after the buyers of the first Signature modular home he built sued him because of construction problems.

There was also evidence that while Signature gives its builders tours of its plants as training, there is "no kind of standardization or quality control practice for what actually is said during these plant tours." As Bradley testified, "It depends on which sales rep takes them through." Further, Figueroa's father testified that before becoming a Signature dealer, he did not receive *any* formal instruction on how to build a Signature modular home. He did not take a training course; nor was he provided a book or given a test on how to build such a home.

From this evidence, viewed in the light most favorable to the plaintiffs, the jury could reasonably have found that Signature's statements about its builders were deceptive. Thus, we hold that the trial court did not err when it denied Signature's motion for JNOV on this ground.

## III

Signature next contends that the trial court erred when it failed to grant Signature's motion for remittitur. Signature asserts that remittitur was required because the plaintiffs offered "little or no evidence to support their damages claims."

New Hampshire law does not require that damages be calculated with mathematical certainty, and the method used to compute them need not be more than an approximation. *Transmedia Restaurant Co.*, 149 N.H. at 461 (quotation omitted). Whether remittitur is appropriate rests with the trial court's sound discretion. *Kelleher v. Marvin Lumber & Cedar Co.*, 152 N.H. 813, 838 (2005). Direct review of a damages award "is the responsibility of the trial judge, who may disturb a verdict as excessive (or inadequate) if its amount is conclusively against the weight of the evidence." *Daigle v. City of Portsmouth*, 129 N.H. 561, 588 (1987) (quotation omitted). The court may also order remittitur if the verdict is "manifestly exorbitant." *Id.* (quotation omitted). The amount of a verdict is conclusively against the weight of the evidence only if no reasonable jury could have reached it. *Mullin v. Joy*, 145 N.H. 96, 96 (2000).

Once the trial court has reviewed the amount of the verdict under this standard, we will not disturb the judge's finding unless no reasonable

person could make it. *Daigle*, 129 N.H. at 588. "Our task on review is not to attempt to ascertain or divine the one and only correct verdict." *Transmedia Restaurant Co.*, 149 N.H. at 463 (quotation omitted). Absent an unsustainable exercise of discretion, we will not reverse the trial court's decision. *Kelleher*, 152 N.H. at 838. The party seeking to modify the verdict's amount bears a heavy burden. *Id.* Based upon our review of the record, we conclude that the trial court did not unsustainably exercise its discretion by denying Signature's motion for remittitur. There is evidence in the record to support the damage award.

 The jury was instructed, without objection, that it could award damages "[f]or each item of loss or harm that the plaintiffs claim," provided that the plaintiffs proved the loss and that it was caused or substantially caused by the defendants' negligence. The plaintiffs testified that their out-of-pocket costs were approximately $182,000. Additionally, there was evidence that they lost wages of approximately $3,000, and, because their garage was never built, had paid $85 per month for two storage units, for a total of $1,785. Moreover, the plaintiff's expert testified that they could not have been fully compensated for their injuries without demolishing their current home and building a new one. Further, the plaintiffs testified that they expected to move into their home in October 2003 and did not move into it until January 2004. In the meantime, they and their two teenage children and two dogs lived in a small camper on the property. Given this evidence and the court's broad instruction to the jury, we cannot conclude that the trial court unsustainably exercised its discretion when it ruled that the jury's award of $250,000 was not exorbitant or conclusively against the manifest weight of the evidence.

To the extent that Signature asserts on appeal that the trial court erred when it doubled the damages because the evidence did not support a finding that Signature acted knowingly or willfully, *see* RSA 358-A:10 (1995), we observe that Signature has failed to demonstrate that it preserved this claim for appellate review and has failed to develop its argument sufficiently for our review. *See State v. Blackmer*, 149 N.H. 47, 48-49 (2003).

## IV

Finally, Signature asserts that the trial court erred when it required Signature to post a bond sufficient to cover the damages award.

We first address the plaintiffs' assertion that Signature's argument is moot because it submitted cash in lieu of the required bond. Whether the trial court had the authority to require an appeal bond may be moot, but as

the plaintiffs conceded at oral argument, the trial court's authority to require security of any kind is not a moot issue.

Signature first argues that the trial court had no authority to require it to post security. We disagree.

Before trial, the plaintiffs sought to attach "any modular homes, cash and/or checks belonging to Signature in the State of New Hampshire." The trial court denied the plaintiffs' motion to attach after finding that "Signature has sufficient assets to satisfy a judgment in this case and because the assets sought to be attached, modular homes purchased by others and transported into New Hampshire, are not appropriate for such."

After the jury returned its verdict, the plaintiffs renewed their petition to attach. The plaintiffs alleged that attachment was warranted because "Signature's assets are located primarily outside of the State" and the plaintiffs "have suffered great economic loss and . . . seek to protect their ability to recover the judgment to which they are entitled." Alternatively, the plaintiffs asked the court to order Signature to post a bond sufficient to satisfy the damage award. They asserted that such a bond was necessary "to prevent injustice."

Signature objected to the motion to renew the petition to attach on the ground that its property "mov[]es within interstate commerce and is beyond the attachment power of the Court for that reason." Signature further asserted that either requiring it to post a bond or attaching its property would cause it to suffer undue prejudice.

Following a hearing, the trial court granted the plaintiffs' motion. Because it was concerned about the impact that an attachment would have upon the conduct of Signature's business in the state and its customers, the court granted the plaintiffs' request for alternative relief and ordered Signature to post a bond sufficient to cover the damage award. The court found that Signature failed to "demonstrate[] or even represent[ ] that it will be able to satisfy the judgment."

Under the circumstances of this case, we hold that this was not error. Contrary to Signature's assertions, the trial court had the inherent equitable authority to require Signature to post security. *See* RSA 498:1 (Supp. 2006).

"The trial court has broad and flexible equitable powers which allow it to shape and adjust the precise relief to the requirements of the particular situation." *Dunlop v. Daigle*, 122 N.H. 295, 300 (1982) (quotation omitted); *see also N.H. Donuts, Inc. v. Skipitaris*, 129 N.H. 774, 783 (1987) (it is historic purpose of equity to secure complete justice and courts may adjust remedies to grant necessary relief).

Further, "[i]t is settled law that an appeal to this Court from a *nisi prius* court does not necessarily stay all further proceedings in the trial court, nor does it strip said court of all power over the proceeding in which the appeal has been taken." *In the Matter of Nyhan & Nyhan*, 151 N.H. 739, 745 (2005) (quotation and brackets omitted). In addition to other things, the trial court "may make such orders and decrees as may be necessary for the protection and preservation of the subject matter of the appeal." *Id.* (quotation omitted). Even after an appeal has been perfected, the trial court "has adequate authority and jurisdiction to preserve the status quo." *Id.* (quotation omitted).

Thus, in *Nyhan*, we upheld a trial court's order requiring the respondent in that divorce case to pay the petitioner $2,600,000 within ten days of the clerk's notice of the trial court's order following remand. *Id.* at 745-46. In that case, the court ordered the respondent to make this payment to prevent him from further dissipating assets. *Id.* at 746. Here, we conclude that the trial court had the inherent authority to protect the subject matter of the appeal—the jury's damage award. *See In the Matter of Hampers & Hampers*, 154 N.H. 275 (2006) (upholding trial court's order requiring petitioner to pay respondent $500,000 in the event of an appeal to permit her to secure suitable housing for her and the parties' child).

To the extent that Signature asserts that the trial court's determination that it had failed to demonstrate or represent its ability to satisfy the judgment was in error, we observe that because Signature has failed to provide a transcript of the hearing in question, we must assume that the evidence supports the trial court's finding. *See Tiberghein v. B.R. Jones Roofing Co.*, 151 N.H. 391, 394 (2004).

Finally, Signature contends that the requirement that it post security violated its state constitutional right to access to courts. Part I, Article 14 of the State Constitution states:

> Every subject of this state is entitled to a certain remedy, by having recourse to the laws, for all injuries he may receive in his person, property, or character; to obtain right and justice freely, without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws.

"The purpose of this provision is to make civil remedies readily available, and to guard against arbitrary and discriminatory infringements on access to the courts." *Town of Nottingham v. Newman*, 147 N.H. 131, 134-35 (2001) (quotation omitted).

Signature has not been denied access to the court. *See id.* at 135. The injury of which it now complains, having to post security, came as a

result of a hearing in superior court regarding its ability to pay the damages award. *See id.* Signature has contested this requirement in superior court and this court. *See id.* Accordingly, we cannot say that the trial court's order was an arbitrary or discriminatory infringement upon Signature's access to the court, in violation of Part I, Article 14 of the State Constitution. *See id.*

*Affirmed.*

BRODERICK, C.J., and DUGGAN, GALWAY and HICKS, JJ., concurred.