Hillsborough-northern judicial district
No. 2007-807

JOSEPH P. GOUDREAULT, JR.

v.

THOMAS J. KLEEMAN

Argued: September 16, 2008
Opinion Issued: January 9, 2009

*Sullivan & Gregg, P.A.*, of Nashua (*Kenneth M. Brown* on the brief and orally), for the plaintiff.

*Nelson, Kinder, Mosseau & Saturley, P.C.*, of Manchester (*Peter W. Mosseau* and *Jonathan A. Lax* on the brief, and *Mr. Mosseau* orally), for the defendant.

HICKS, J. The defendant, Thomas J. Kleeman, M.D., appeals rulings of the Superior Court (*Murphy*, J.) made during a medical malpractice trial. The plaintiff, Joseph P. Goudreault, Jr., cross-appeals the apportionment of fault to non-litigants and the failure to impose joint and several liability upon Dr. Kleeman. We reverse and remand.

The record supports the following. Goudreault developed a back problem in 2001. He consulted Dr. Kleeman, an orthopedic surgeon specializing in spine surgery, who initially recommended conservative therapies. These were unsuccessful and diagnostic testing revealed degeneration in the discs and cartilage of Goudreault's lower back. Dr. Kleeman recommended a procedure called an anterior lumbar interbody fusion (ALIF). The ALIF procedure uses a bone graft to prevent inflammation by immobilizing the affected discs. The procedure is performed laparascopically to minimize its invasiveness, typically by a vascular surgeon teamed with a spine surgeon.

Goudreault's ALIF was performed at Catholic Medical Center (CMC) in April 2002 by Dr. Kleeman and vascular surgeons Dmitry Nepomnayshy and Patrick Mahon. The operation began at 7:00 a.m., initially with Drs. Kleeman and Nepomnayshy. Although there were no complications with the spinal fusion part of the surgery, complications arose with respect to accessing Goudreault's spine. Vascular injuries occurred causing substan-

tial bleeding and requiring conversion from a laparascopic, minimally invasive approach to a more intrusive open approach. Dr. Kleeman testified that he could not say for sure whether he or Dr. Nepomnayshy caused the vascular injuries. After the vascular injuries arose, Dr. Kleeman left the surgery table and Dr. Mahon assisted Dr. Nepomnayshy. Dr. Kleeman returned to complete the ALIF after the vascular injuries were repaired and the bleeding was controlled. The surgery concluded around 4:00 p.m.

Following the surgery, Goudreault was taken to the post-anesthesia care unit (PACU) at CMC, where he was monitored and given intravenous fluid. The PACU nurse eventually transferred him to the intensive care unit (ICU) for monitoring and contacted Dr. Kleeman and his partner, Dr. Ahn, around 9:00 p.m. due to concern over some of his symptoms. Dr. Kleeman, who was familiar with compartment syndrome, observed Goudreault around 9:30 p.m. and saw no symptoms of the complication.

Dr. Kleeman began to suspect compartment syndrome in Goudreault's left calf the following morning when he observed him at 6:30 a.m. He testified that he then called Dr. Mahon. The substance and timing of the telephone call to Dr. Mahon were disputed, and the court instructed the jury to consider Dr. Kleeman's testimony only as evidence that a telephone call was made and not as evidence that Dr. Mahon agreed to take responsibility for treating any potential compartment syndrome. The ICU nurse observing Goudreault testified that she also contacted Dr. Mahon around 6:30 a.m. and updated him on Goudreault's condition.

Around 6:45 a.m., Dr. Kleeman requested a tonometer, which is a device that can detect compartment syndrome by measuring pressure in the leg. The ICU nurse testified that she left and asked the charge nurse for the instrument, returned to tell Dr. Kleeman that there was a tonometer in the emergency room, but found that he had left. Dr. Kleeman testified that he left before the nurse returned because she had informed him that she did not think CMC had a tonometer.

Several hours elapsed before surgery took place to treat Goudreault's compartment syndrome, during which time Dr. Kleeman performed scheduled elective surgery at another hospital. Dr. Kleeman testified that he placed several telephone calls to Dr. Mahon and the hospital attempting to discover Goudreault's condition. He returned to observe Goudreault around 11:30 a.m. and made additional notes on his chart. Dr. Mahon did not perform the surgery to relieve the pressure in Goudreault's leg until around 2:00 p.m., when the compartment syndrome had reached an advanced state. Goudreault suffered a permanent loss of the peroneal nerve, which runs through one of the compartments in the leg. Although he saw improvement in his back pain, Goudreault testified that he now experiences pain, numbness and difficulty walking.

Goudreault initiated the instant action for professional negligence against CMC and Drs. Nepomnayshy, Mahon and Kleeman. Dr. Kleeman was the sole trial defendant, however, because Goudreault settled with the other defendants. Goudreault introduced evidence of several breaches of Dr. Kleeman's duty of care, including responsibility for causing at least one of the four vascular injuries and for failing to timely diagnose and treat compartment syndrome.

Goudreault maintained that Dr. Kleeman advised him that he would supervise the surgical team performing the ALIF. Dr. Kleeman disputed this, and denied any general responsibility for Goudreault's condition as the admitting physician. Dr. Kleeman further testified that he was not qualified to treat the compartment syndrome and that vascular issues were the vascular surgeon's responsibility. He acknowledged that Dr. Mahon did not act quickly upon being informed of the suspected compartment syndrome, but denied any responsibility for the delay. Additionally, because he was not present for Goudreault's entire surgery, Dr. Kleeman said his "index of suspicion" regarding compartment syndrome was not high and that he relied upon Drs. Nepomnayshy and Mahon to also monitor Goudreault's condition.

Both sides presented expert testimony. Goudreault called Dr. Michael Golding, a surgeon with vascular training and board-certification in thoracic, cardiovascular and general surgery. Dr. Golding testified that surgical teams commonly have leaders, and that the attending surgeon, in this case Dr. Kleeman, typically heads the team. He further testified that, although injuries to blood vessels sometimes happened during spinal surgery, they are rare. He testified that the quantity and severity of the injuries to Goudreault's blood vessels fell far below the standard of reasonable surgical care. Although Dr. Golding initially said that it was difficult to tell whether Dr. Nepomnayshy or Dr. Kleeman caused the injuries, he later testified that it was more likely than not that Dr. Kleeman caused at least one of Goudreault's vascular injuries.

As for the compartment syndrome, Dr. Golding opined that as Goudreault's admitting physician, Dr. Kleeman was responsible for post-surgical monitoring. In Dr. Golding's opinion, the circumstances of Goudreault's surgery created an environment that predisposed him to compartment syndrome and any surgeon would know that vascular injury was one of its common causes. He also testified that Dr. Kleeman breached the standard of reasonable care by failing to timely confirm or deny the presence of compartment syndrome, notwithstanding the presence of warning signs. He testified that early diagnosis and treatment of compart-

ment syndrome usually averts permanent injury and that Dr. Kleeman's failure to timely diagnose and treat the compartment syndrome caused permanent injuries.

Dr. Kleeman called two expert witnesses: Dr. Bruce Morgan, a board-certified general and vascular surgeon, and Dr. John Regan, a board-certified orthopedic surgeon and internist who had performed over two thousand ALIFs. Both disputed the assertions that Dr. Kleeman breached duties of care and caused Goudreault's injuries.

At the close of evidence, both parties moved for a directed verdict. Dr. Kleeman argued that no jury could reasonably find for Goudreault on the count alleging negligent vascular injury because Dr. Golding's expert opinion on causation was speculative. As to the count alleging negligent postoperative care, Dr. Kleeman argued that Dr. Golding lacked the requisite experience with ALIFs to give expert testimony on the breach of duty. Goudreault moved for a directed verdict prohibiting the apportionment of fault to Drs. Nepomnayshy and Mahon for lack of adequate evidence. The trial court denied each motion.

After the jury was instructed and heard closing arguments, the court explained the special verdict form. The first question asked whether the defendant was at fault for the plaintiff's injuries. If so, the jury was instructed to address question two, which asked the jury to determine the total amount of damages.

Upon learning that the jury was deadlocked, the court gave an additional charge that apprised the jury, for the first time, of its ability to apportion fault to non-litigants. The court cautioned the jury not to "reach that issue unless you find D[r.] Kleeman is responsible to any degree." The court then instructed the jury to deliberate further.

Thereafter, the jury foreperson submitted a written question to the court asking:

> Does a Decision which Favors The Defendant Preclude other Remedies? ie is it Necessary before [pursuing] other People i.e. Is it necessary to prove Dr. K's negligence in order to seek remedy from other parties? (For example, Dr. Mahon?)

Over Dr. Kleeman's objection, the court responded in writing:

> [I]n order for any apportionment of fault among parties other than the defendant Dr. Kleeman to occur, Dr. Kleeman would have to be found legally at fault for plaintiff's injuries to some degree.

The jury then returned an affirmative response to the first question regarding liability but failed to answer the second question concerning

damages. The court gave the jury another special verdict form with two additional questions: question three asked whether non-litigants were at fault and, if the answer was "yes," question four asked the jury to attribute percentages of fault to each. The court instructed the jury to proceed to the remaining questions and apportion fault "to each person who [it] determine[d] contributed to cause [Goudreault's] injuries." It reminded the jury that the defendant bore the burden of proving the fault of non-litigants. Each counsel then gave further closing arguments on the issue of apportionment. The jury found total damages of $1,109,000 and attributed 10% of fault to Dr. Kleeman, 20% of fault to Dr. Nepomnayshy and 70% of fault to Dr. Mahon.

On appeal, Dr. Kleeman argues that the trial court committed reversible error by: (1) qualifying Dr. Golding as an expert witness; (2) permitting Dr. Golding to opine that Dr. Kleeman likely caused at least one of Goudreault's vascular injuries; (3) granting Goudreault's motion *in limine* to exclude impeachment of Dr. Golding by the American College of Surgeons' (ACS) policy statement; and (4) unfairly prejudicing the jury by submitting a nonresponsive and misleading answer to its question during deliberations.

Goudreault cross-appeals, arguing that: (1) Dr. Kleeman should be jointly liable with Drs. Nepomnayshy and Mahon under RSA 507:7-e, I(c) (1997); and (2) Dr. Kleeman failed to adduce adequate evidence to apportion fault to non-litigants pursuant to our holdings in *Nilsson v. Bierman*, 150 N.H. 393 (2003), and *DeBenedetto v. CLD Consulting Eng'rs*, 153 N.H. 793 (2006).

We reverse and remand based upon the court's response to the jury's question. We address the remaining issues because they "are likely to arise on remand." *Figlioli v. R.J. Moreau Cos.*, 151 N.H. 618, 622 (2005).

*I. Testimony of Dr. Golding*

*A. Qualification as an Expert Witness*

Dr. Kleeman first argues that the trial court erred by allowing Dr. Golding to offer expert testimony. He argues that Dr. Golding was not qualified because he had not operated since 1986 and had relinquished all surgical privileges by 1988. Additionally, Dr. Kleeman points out that Dr. Golding "was never trained in and had never performed any lapar[a]scopic surgery, observed an ALIF, or cared for a post-operative ALIF patient."

Goudreault counters that, although Dr. Golding retired from surgery for health reasons, he remained active in medicine. Goudreault points out that his was not strictly a laparascopic procedure because the complications required conversion to an open approach, which was within Dr. Golding's experience. Goudreault asserts that Dr. Golding was "very familiar with

the . . . lumbar anatomy" and "while [he] had never performed a lapar[a]scopic spinal surgery, he was well familiar with the techniques and [related] equipment." Goudreault maintains that vascular injuries are not unique to the ALIF procedure and that compartment syndrome can arise from various types of surgery.

■ Expert witness testimony is required to establish a *prima facie* medical negligence case. *See* RSA 507-E:2, I (1997). A witness is "qualified as an expert by knowledge, skill, experience, training, or education." N.H. R. Ev. 702. "In deciding whether to qualify a witness as an expert, the trial judge must conduct an adequate investigation of the expert's qualifications." *Milliken v. Dartmouth-Hitchcock Clinic*, 154 N.H. 662, 667 (2006) (quotation omitted); *cf.* RSA 516:29-a, I (2007).

■ "Because the trial judge has the opportunity to hear and observe the witness, the decision whether a witness qualifies as an expert is within the trial judge's discretion." *Milliken*, 154 N.H. at 667 (quotation omitted). We will not reverse that decision absent a clearly unsustainable exercise of discretion. *Hodgdon v. Frisbie Mem. Hosp.*, 147 N.H. 286, 289 (2001); *State v. Lambert*, 147 N.H. 295, 296 (2001). Our inquiry is "whether the record establishes an objective basis sufficient to sustain the discretionary judgment made." *Lambert*, 147 N.H. at 296. To prevail on appeal, "the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." *Id.* (quotation omitted).

After a hearing, the trial court ruled that "[b]ased on his training and experience, . . . Dr. Golding is qualified to render his opinions about the surgery performed on the plaintiff and his follow-up care" together with opinions about "the role and responsibility of Dr. Kleeman as the lead surgeon . . . on plaintiff's procedure."

■ We cannot say that the trial court's ruling was an unsustainable exercise of discretion. Dr. Golding had training in vascular surgery and was board-certified in thoracic, cardiovascular and general surgery. Although he no longer operates, he has been licensed to practice medicine since 1959 and is currently licensed to practice in three states. During his career, he taught medicine, performed research and practiced as a cardiac surgeon. He is an attending surgeon and consultant at three different hospitals. In addition to teaching surgeons about compartment syndrome, Dr. Golding authored a chapter about vascular trauma in a medical textbook including a discussion of compartment syndrome.

■ Dr. Golding's lack of laparascopic ALIF experience and training does not negate his ability to advance the jury's understanding and determination of facts at issue. "Although a medical degree does not automatically

qualify a witness to give an opinion on every conceivable medical question," *Mankoski v. Briley*, 137 N.H. 308, 313 (1993) (quotation omitted), we have held that "[t]he lack of specialization in a particular medical field does not automatically disqualify a doctor from testifying as an expert in that field." *Milliken*, 154 N.H. at 667 (quotation omitted); *see also Mankoski*, 137 N.H. at 312 ("An orthopedic surgeon is not *per se* unqualified to render expert testimony on the psychological health of a patient.").

Although Dr. Golding had not operated on patients since 1986 and had never personally performed an ALIF, he had performed surgery in the posterior lumbar area hundreds of times and had assisted to resolve major vascular problems that occurred during spinal fusions. Thus, we find no error in the trial court's ruling qualifying Dr. Golding as an expert. *See* N.H. R. Ev. 702.

### B. Causation of Vascular Injuries

Dr. Kleeman next argues that the trial court erred by allowing Dr. Golding to opine that Dr. Kleeman more likely than not caused at least one of Goudreault's vascular injuries. Dr. Kleeman points out that Dr. Golding also testified that either Dr. Nepomnayshy or Dr. Kleeman could have caused Goudreault's vascular injuries. He contends that Dr. Golding's opinion on causation had no foundation under RSA 516:29-a, I, because of insufficient facts or data and a lack of "reliable principles reliably applied to the facts of th[is] case."

Goudreault argues that Dr. Golding's opinion was admissible because he based it upon the records, depositions and testimony coupled with his experience as a surgeon. Goudreault maintains that any inconsistent testimony given by Dr. Golding should go the weight of his opinion, not its admissibility.

To make out a *prima facie* case of medical negligence, a plaintiff must introduce, by expert testimony, "evidence sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence and the injury probably existed." *Bronson v. The Hitchcock Clinic*, 140 N.H. 798, 801 (1996); *see* RSA 507-E:2, I(c). "The plaintiff need only show with reasonable probability, not mathematical certainty, that but for the defendant's negligence, the harm would not have occurred." *Bronson*, 140 N.H. at 802-03.

A medical expert's competent opinion that the defendant's negligence "probably caused" the harm establishes the quantum of expert testimony necessary. *See id.* at 802; *see also* N.H. R. Ev. 704; *Emerson v. Bentwood*, 146 N.H. 251, 256 (2001). However, such an opinion is admissible only after it has been shown to the satisfaction of the court that the

"testimony is based upon sufficient facts or data; . . . is the product of reliable principles and methods; and . . . [that t]he witness has applied the principles and methods reliably to the facts of the case." RSA 516:29-a, I; *see also* N.H. R. Ev. 702. Thus, "an expert's testimony must rise to a threshold level of reliability to be admissible under New Hampshire Rule of Evidence 702." *Emerson*, 146 N.H. at 254 (quotation omitted).

> The proper focus for the trial court is the reliability of the expert's methodology or technique. The trial court functions only as a gatekeeper, ensuring a methodology's reliability before permitting the fact-finder to determine the weight and credibility to be afforded an expert's testimony.

*Baker Valley Lumber v. Ingersoll-Rand*, 148 N.H. 609, 616 (2002).

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

N.H. R. Ev. 703.

The trial court permitted Dr. Kleeman to explore the basis for Dr. Golding's opinion in the jury's presence before allowing him to render an opinion on causation. Dr. Golding testified that "[t]he basis is when I reviewed the records and some depositions and testimony that I heard here yesterday and forty years of experience in surgery." Dr. Golding conceded that the records he reviewed did not expressly identify which doctor caused the vascular injuries, but he elaborated that "[i]n reviewing the operative records, there was a progression of major bleeding episodes" coupled with his "sense of how dissection in the retro-peroneal space is done, and how vessels get injured in the retro-peroneal space." He added that the "use of blunt and sharp dissection . . . requires traction and counter-traction" performed by two sets of hands, which occurred here in an area of blood vessels that "can easily be damaged by either traction or counter-traction." Dr. Golding testified that two vascular injuries were "[c]ertainly" caused by traction and a third "could be from the traction."

The trial court recessed to examine the record outside of the jury's presence in response to Dr. Kleeman's objection. Dr. Golding was then allowed to give his opinion "that more likely than not that Doctor Kleeman caused at least one of these vascular injuries."

█ The trial court did not expressly rule as to the reliability of Dr. Golding's methodology. He appears to have relied upon something akin to

"differential etiology," *Baker Valley Lumber*, 148 N.H. at 616, "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999). We find no error in admitting this testimony because admissibility of expert opinions turns upon the "reliability of the expert's methodology or technique," *Baker Valley Lumber*, 148 N.H. at 616, and not upon the expert's conclusion, *see id.* at 615; *see also Baxter v. Temple*, 157 N.H. 280, 285 (2008).

■ To the extent there were gaps in Dr. Golding's explanations, "these omissions concern the relative weight and credibility of competing expert testimony rather than the basic reliability of such testimony, and are the province of the fact-finder, not the trial court." *Baker Valley Lumber*, 148 N.H. at 615. "[O]bjections to the basis of an expert's opinion go to the weight to be accorded the opinion evidence, and not to its admissibility." *Id.* (quotation omitted). "The appropriate method of testing the basis of an expert's opinion is by cross-examination of the expert." *Id.* at 615-16 (quotation omitted).

### C. Use of ACS Policy for Impeachment

Prior to trial, Goudreault sought to exclude any evidence suggesting that, by testifying, Dr. Golding was failing to abide by the ACS policy statement on expert testimony because he lacked sufficient experience to offer opinion testimony on matters related to the ALIF procedure. The Trial Court (*McGuire*, J.) denied Goudreault's motion *in limine*, ruling that the "standard is relevant to the competency and credibility of Dr. Golding, particularly where he is a Fellow of the [ACS], and is not unfairly prejudicial." Goudreault moved for reconsideration clarifying that he objected only to identification of the ACS as the source of statements and not their contents. The Trial Court (*Murphy*, J.) reconsidered the earlier decision and granted Goudreault's motion *in limine*, ruling "it is appropriate to prevent injustice."

Dr. Kleeman argues that the trial court "erred by granting plaintiff's untimely motion to reconsider." He urges that the policy statement "exposed a legitimate basis for rejecting Dr. Golding's testimony" because it "would have demonstrated [that] the professional organization Dr. Golding relies upon to burnish his reputation had promulgated recommendations that, if . . . followed, would have precluded him from testifying" due to a lack of experience and demonstrated competence in ALIF surgery and post-operative care. Dr. Kleeman cites case law attaching weight to similar policies promulgated by the American Association of Neurosurgeons. *See*

*Austin v. American Ass'n of Neurological Surgeons*, 253 F.3d 967 (7th Cir. 2001), *cert. denied*, 534 U.S. 1078 (2002).

Goudreault argues that "medical specialty societies, such as ACS, . . . should not have any role in determining the qualifications of any expert witness in a judicial proceeding." Rather, he maintains that the trial court made the determination that Dr. Golding was qualified as an expert guided by judicial standards and not those of a private organization.

We review a trial court's decisions on the admissibility of evidence under an unsustainable exercise of discretion standard. *Boynton v. Figueroa*, 154 N.H. 592, 599-600 (2006). We will not disturb the trial court's decision absent an unsustainable exercise of discretion. *Id.* at 600. "To meet this standard, [Dr. Kleeman] must demonstrate that the trial court's rulings were clearly untenable or unreasonable to the prejudice of h[is] case." *Desclos v. S. N.H. Med. Ctr.*, 153 N.H. 607, 610 (2006).

 We cannot say that the trial court's ruling was unreasonable or untenable. "[T]he power to [reconsider an issue once decided] remains in the court until final judgment or decree." *Redlon Co. v. Corporation*, 91 N.H. 502, 506 (1941) (quotation omitted). "It is immaterial that different judges act." *Id.* Upon clarification of Goudreault's motion *in limine*, Judge Murphy concluded that reconsideration of Judge McGuire's prior ruling was necessary to prevent injustice. The trial court could have reasoned that its ruling was necessary to avoid juror confusion regarding the threshold determination of expert witness competency. *Emery v. Company*, 89 N.H. 165, 169 (1937) ("The question whether one possesses the requisite qualifications to testify as an expert is one of fact for the trial court . . . ."). Thus, we cannot say the trial court's ruling exceeded its "broad discretion to fix the limits of cross-examination." *State v. Miller*, 155 N.H. 246, 253 (2007).

## II. The Supplemental Jury Instruction

Dr. Kleeman maintains that the trial court committed reversible error by submitting a nonresponsive answer to a deadlocked jury, resulting in a verdict that was the product of bias and confusion about the law. Noting the jury's ignorance of the previous settlements reached with Drs. Mahon and Nepomnayshy, he maintains that the correct response to the jury's question was that Goudreault's remedies against the other doctors would not be affected by its finding on Dr. Kleeman's liability. He argues that "the jury's verdict was based on the mistaken belief that unless it found [him] liable[,] . . . Goudreault would be left without a remedy."

Goudreault argues that the trial court's response was a correct statement of the law because "[i]f Dr. Kleeman was not [found to be] legally at fault

to any degree, [then he] could not pursue anyone else because he had settled with those parties." Goudreault also argues that the original jury instructions regarding liability and collateral sources of recovery were sufficient to ensure that the jury understood the requisites for a determination of liability. Finally, Goudreault argues that any perceived prejudice is but "wild speculation."

■■■ "The response to a jury question is left to the sound discretion of the trial court." *State v. Stewart*, 155 N.H. 212, 214 (2007) (quotation omitted). "[W]e review the court's response under the unsustainable exercise of discretion standard." *Id.* "First, [the party challenging an instruction] must show that it was a substantial error such that it could have misled the jury regarding the applicable law." *Francoeur v. Piper*, 146 N.H. 525, 531 (2001). "The instruction must be judged as a reasonable juror would probably have understood it . . . ." *State v. Dingman*, 144 N.H. 113, 115 (1999). "We review the trial court's answer to a jury inquiry in the context of the court's entire charge to determine whether the answer accurately conveys the law on the question and whether the charge as a whole fairly covered the issues and law in the case." *Stewart*, 155 N.H. at 214 (quotation omitted). Even if the supplemental instruction is shown to be a substantial error, we will only set aside a jury verdict if the error resulted in mistake or partiality. *See Babb v. Clark*, 150 N.H. 98, 100 (2003) (quotation omitted); *Francoeur*, 146 N.H. at 531.

### A. The Question and Answer

■■ ■■ "[T]he general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Childs*, 636 N.E.2d 534, 539 (Ill. 1994). It should address "those matters fairly encompassed within the question." *Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 176 (1st Cir. 1998). Here, we conclude that the trial court committed a substantial error in answering the jury's question. The question posed to the court was reasonably susceptible of competing interpretations. The jury asked:

> Does a Decision which Favors The Defendant Preclude other Remedies? ~~ie is it Necessary before [pursuing] other People~~ i.e. Is it necessary to prove Dr. K's negligence in order to seek remedy from other parties? (For example, Dr. Mahon?)

One trained in the law might interpret this as an inquiry about the apportionment of fault and whether that issue is germane to the threshold finding of liability. However, we believe the better reading of the question, especially in view of the portion that was stricken, is whether returning a

defendant's verdict on liability would foreclose the plaintiff from pursuing damages against other persons involved in bringing about his alleged harm.

The trial court responded to the former interpretation but ignored the latter. At best, its response addressed one possible, though unlikely, interpretation of the jury's inquiry. At worst, it was entirely nonresponsive. Thus, it likely "was, in effect, no response at all." *Van Winkle v. Owens-Corning Fiberglas*, 683 N.E.2d 985, 991 (Ill. App. Ct. 1997); *see Bollenbach v. United States*, 326 U.S. 607, 613-15 (1946) (declining to sustain conviction where question and answer between judge and deliberating jury was subject to multiple interpretations). "The failure to answer or the giving of a response which provides no answer to the particular question of law posed . . . [can result in] prejudicial error." *Van Winkle*, 683 N.E.2d at 990 (quotation omitted). The trial court should have taken special care to specifically and accurately dispel any confusion about the law. *See id.*; *Bollenbach*, 326 U.S. at 612-13. Accordingly, we cannot sustain its answer to the deadlocked jury's question. *See Lambert*, 147 N.H. at 296.

*B. Prejudice*

The fact that the trial court substantially erred does not end our inquiry. To warrant reversal, the error must be said to have prejudiced Dr. Kleeman. *See Stewart*, 155 N.H. at 217; *Francoeur*, 146 N.H. at 531. We are persuaded that the trial court's error likely caused prejudice.

We begin by noting that "a jury instruction given after deliberations have begun comes at a particularly delicate juncture and therefore evokes heightened scrutiny." *Testa*, 144 F.3d at 175. In addition, the jury's question evinces confusion about the law and its application to a dispositive issue, *see Van Winkle*, 683 N.E.2d at 991; *Hassler v. Simon*, 466 N.W.2d 434, 437 (Minn. Ct. App. 1991), which was heavily disputed at trial, *see Stewart*, 155 N.H. at 217; *Francoeur*, 146 N.H. at 531-32. The court's nonresponsive answer likely permitted lingering confusion at minimum or even promoted misapprehension about the applicable law by "impl[ying] that the jury must find [Dr. Kleeman] negligent if [Goudreault] was to recover anything for [his] damages." *Hassler*, 466 N.W.2d at 437.

Although we consider the trial court's supplemental instruction in the context of the whole jury charge, *see Francoeur*, 146 N.H. at 531, the prior charge on collateral sources of recovery and the requisites of professional negligence did not cure the prejudice. *See id.*; *Baraniak v. Kurby*, 862 N.E.2d 1152, 1157 (Ill. App. Ct.) (trial court has duty to resolve jury confusion about law "[even though] the jury was properly instructed" originally), *appeal denied*, 871 N.E.2d 54 (Ill. 2007). "The influence of the trial judge on the jury is necessarily and properly of great weight and

jurors are ever watchful of the words that fall from him." *Bollenbach*, 326 U.S. at 612 (quotation and citation omitted). "If [the court's answer] is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptionable and unilluminating abstract charge." *Id.*

Accordingly, we reverse and remand for a new trial.

*III. Joint & Several Liability*

■■■ Goudreault argues that Dr. Kleeman should have been jointly and severally liable. "Under the rule of joint and several liability, a defendant who is only partly responsible for a plaintiff's injuries may be held responsible for the entire amount of recoverable damages." *DeBenedetto*, 153 N.H. at 798. "This allows a plaintiff to sue any one of several tortfeasors and collect the full amount of recoverable damages." *Id.* "As a result, numerous jurisdictions[, including New Hampshire,] have enacted legislation seeking to ameliorate the 'inequities' suffered by low fault, 'deep pocket' defendants . . . ." *Id.* at 799.

Under New Hampshire's statutory scheme, liability is "joint and several" for each party fifty percent at fault or greater. *See* RSA 507:7-e, I(b) (1997). However, where "any party shall be less than 50 percent at fault, then that party's liability shall be several and not joint and he shall be liable only for the damages attributable to him." *Id.* Notwithstanding RSA 507:7-e, I(b), RSA 507:7-e, I(c), restores joint liability by providing, in pertinent part:

> [I]n all cases where parties are found to have knowingly pursued or taken active part in a common plan or design resulting in the harm, [the court shall] grant judgment against all such parties on the basis of the rules of joint and several liability.

RSA 507:7-e, I(c) (1997).

Goudreault asserts that Dr. Kleeman should be jointly liable regardless of his percentage of fault because he "t[ook] active part in a common plan or design," *id.*, with the other doctors operating upon him where each "w[as] responsible for [his] treatment and care[,] . . . stood side by side during surgery and assisted one another[,] . . . wrote notes and observations in the same chart[,] . . . and individually profited [from] the services rendered." We disagree.

> The interpretation of a statute is a question of law, which we review *de novo*. We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. When

a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we will not consider what the legislature might have said or add language that the legislature did not see fit to include. If a statute is ambiguous, however, we consider legislative history to aid our analysis. Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme.

*Cloutier v. City of Berlin,* 154 N.H. 13, 17 (2006) (citations omitted).

We begin our analysis by considering RSA 507:7-e, I(c), in context. RSA chapter 507 is a broad framework governing comparative fault and apportionment of tort liability. *See Nilsson,* 150 N.H. at 395. "The New Hampshire legislature first enacted a comparative negligence statute in 1969, motivated by a deep conviction that the contributory negligence rule was so basically unfair and illogical that it should have no further place in the State's law." *DeBenedetto,* 153 N.H. at 808 (quotation and brackets omitted). "However, the statute abolished not only contributory negligence, but joint and several liability as well." *Id.*

In 1986, the legislature separated the concepts of apportionment and contributory negligence, "enact[ing] section 7-d to address contributory negligence and section 7-e to address apportionment." *Nilsson,* 150 N.H. at 397. "As enacted in 1986, section 7-e provided for apportionment of damages in all actions, not only those involving contributorily negligent plaintiffs." *Id.* (quotation and brackets omitted). "[T]he legislature [thereby] established a system for contribution among tortfeasors and reinstituted joint and several liability," *DeBenedetto,* 153 N.H. at 808, for " 'each party liable,' " *id.* at 798 (quoting Laws 1986, 227:2).

"In 1989, the legislature amended section 7-e, I(b) to protect minimally liable defendants." *Nilsson,* 150 N.H. at 399 (quotation omitted). "[R]ecognizing that manufacturers, professionals and public agencies become targets for damage recoveries because of their potential money resources rather than their fault, [it] sought to amend RSA 507:7-e to treat fairly those entities which may be unfairly treated under the rule of joint and several liability." *DeBenedetto,* 153 N.H. at 799 (quotations and ellipsis omitted). "[It] rejected [a] pure several liability approach and instead passed a compromise measure adopting several liability only for those parties less than 50 percent at fault." *Id.* (quotation omitted). "The resulting legislation made New Hampshire a hybrid jurisdiction" employing both several and joint liability. *Id.* "[T]he comprehensive scheme of RSA chapter

507 reflects the legislature's careful balance of the rights of defendants and plaintiffs . . . [, and i]t is not our place to upset this balance." *Nilsson*, 150 N.H. at 400.

█ The plain language of RSA 507:7-e, I(c) imposes joint liability where a tortfeasor (1) knowingly (2) pursued or took active part in (3) a common plan or design (4) resulting in harm. *See* RSA 507:7-e, I(c). The present dispute centers upon what the legislature meant by "a common plan or design." *Id.* Goudreault argues that its plain meaning is "concerted action, taken by each with knowledge of the others' participation" without proof of civil conspiracy or specific intent. He argues it is enough that the doctors "t[ook] a conscious part in a common plan which results in harm." On the other hand, Dr. Kleeman argues that Goudreault's construction "would have the absurd result of subjecting every doctor involved in a patient's care to joint and several liability for the full extent of the patient's [] damages." He maintains that RSA 507:7-e, I(c) "creates a narrow exception to several liability, preserving the common law rule of joint and several liability when there is concerted wrongful activity such as . . . civil conspiracy or when a defendant intentionally aids and abets another's tortious conduct."

We note that of the several ways one may be subject to joint and several tort liability, RSA 507:7-e, I(c), most closely resembles the common law imposition of joint and several liability for concerted activity. *See* 2 J.D. LEE & B. A. LINDAHL, MODERN TORT LAW LIABILITY & LITIGATION § 19:4, at 19-7 to -8 (2d ed. 2002); RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY § 15 (2000). Recognizing this, both parties attempt to define what constitutes concerted activity; specifically, whether it contemplates collaboration to achieve a tortious result, or, conversely, if the pursuit of a desirable result gone awry due to negligence is sufficient.

█ Goudreault correctly points out that the legislature did not include words such as "common plan or design" *to commit a tortious act.* However, neither did it require a "common plan or design" to achieve any other variety of result. The better reading of the statute, considering its object and purpose, takes account of the fact that, to be subject to RSA 507:7-e, I(c), the conduct must be undertaken "knowingly." Under the Criminal Code, "[a] person acts knowingly with respect to conduct or to a circum-stance . . . when he is aware that his conduct *is of such nature* or *that such circumstances exist.*" RSA 626:2, II(b) (2007) (emphases added). "In other words, a defendant acts knowingly when he is aware that it is practically certain that his conduct will cause a prohibited result." *State v. Hall*, 148 N.H. 394, 398 (2002) (quotation omitted).

 We believe the legislature required the mental state of "knowingly" as a limited exception restoring common law joint liability for "[a]ll those who, in pursuit of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's acts done for their benefit." W. KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 46, at 323 (5th ed. 1984) (footnotes omitted).

 In this way, the requirements of RSA 507:7-e, I(c) resemble the concerted activity of civil conspiracy. *See Jay Edwards, Inc. v. Baker*, 130 N.H. 41, 47 (1987) (outlining elements of civil conspiracy). "It is . . . essential that each . . . defendant . . . be proceeding tortiously, which is to say with the intent requisite to committing a tort, or with negligence." KEETON, *supra* at 324. However, "[e]xpress agreement is not necessary, and all that is required is that there be a tacit understanding, as where two automobile drivers suddenly and without consultation decide to race their cars on the public highway." *Id.* at 323 (footnotes omitted).

Our construction is guided by the legislative policy behind RSA chapter 507. We have previously observed that RSA 507:7-e, I(c) imposes joint liability only as an *exception* to RSA 507:7-e, I(b). *Rodgers v. Colby's Ol' Place*, 148 N.H. 41, 44 (2002). Goudreault's expansive exception would contravene the legislature's objective of shielding minimally liable tortfeasors from undue civil liability. Dr. Kleeman correctly points out that "[d]octors, lawyers, dentists, and architects rarely practice their trades in isolation" and that Goudreault's construction "would swallow the rule" of several liability.

Finally, we note that our construction accords with the decisions of other states. *See, e.g., GES, Inc. v. Corbitt*, 21 P.3d 11, 15 (Nev. 2001); *Schneider v. Schaaf*, 603 N.W.2d 869, 876 (N.D. 1999); *Kottler v. State*, 963 P.2d 834, 841 (Wash. 1998).

## *IV. Apportionment of Fault to Non-litigants*

 Goudreault argues that Dr. Kleeman failed to adduce "adequate evidence," *DeBenedetto*, 153 N.H. at 804, for the jury to apportion fault to Drs. Mahon and Nepomnayshy. In *Nilsson*, we held "that for apportionment purposes under [RSA 507:7-e, I(b)], the word 'party' refers to parties to an action, including settling parties." *Nilsson*, 150 N.H. at 396 (quotation and ellipsis omitted). In *DeBenedetto*, we elaborated that "the word 'party' [embraces] . . . all parties contributing to the occurrence giving rise to an action, including those immune from liability or otherwise not before the court." *DeBenedetto*, 153 N.H. at 804. However, in order to shift fault, we noted that "allegations of a non-litigant tortfeasor's fault must be sup-

ported by *adequate evidence* before a jury or court may consider it for fault apportionment purposes." *Id.* (emphases added).

Goudreault's effort to preclude apportionment of liability to Drs. Mahon and Nepomnayshy derives from RSA chapter 507-E, the statute governing the elements of a medical negligence plaintiff's *prima facie* case. He argues that the defendant should carry the same or a similar burden of proof in order to shift fault to non-litigants. He premises this argument on equal protection grounds and fundamental fairness to litigants.

Dr. Kleeman argues that New Hampshire law does not require him to apportion fault by presenting a *prima facie* case through "unequivocal expert testimony," testimony from the "apportionees," or evidence from a defense expert. He cites *Wilder v. Eberhart*, 977 F.2d 673 (1st Cir. 1992), *cert. denied*, 508 U.S. 930 (1993), arguing that the burden of proof on causation "rests and remains with the plaintiff."

■ First, we consider whether, as the trial court instructed the jury over his objection, Dr. Kleeman had the burden of proving non-litigant liability. Dr. Kleeman did not appeal this issue, but clarification may assist the litigants upon retrial. Goudreault correctly observes that a civil defendant who seeks to deflect fault by apportionment to non-litigants is raising something in the nature of an *affirmative defense. Cf.* RSA 507:7-d (1997) (stating, with regard to comparative fault of a party, that "[t]he burden of proof as to the existence of amount of fault attributable to a party shall rest upon the party making such allegation"). Thus, the defendant carries the burdens of production and persuasion. *See id.; see also Brann v. Exeter Clinic*, 127 N.H. 155, 159 (1985); *Gust v. Jones*, 162 F.3d 587, 593 (10th Cir. 1998) (interpreting Kansas law to require defendant asserting non-party doctor's fault to bear burden of proving such fault); *Carroll v. Whitney*, 29 S.W.3d 14, 21 (Tenn. 2000) ("[T]he nonparty defense is an affirmative defense [and as such], a jury can apportion fault to a nonparty only after it is convinced that the defendant's burden of establishing that a nonparty caused or contributed to the plaintiff's injury has been met.").

■ We further agree with Goudreault that a defendant who raises a non-litigant apportionment defense essentially "becomes another plaintiff who must seek to impose liability on a [non-litigant] just as plaintiff seeks to impose it on him." Where the defendant seeks to reduce or eliminate the plaintiff's recovery by apportioning professional liability, it is only fair that he or she carry the plaintiff's burden of proof outlined in RSA 507-E:2. That statute requires "affirmative evidence which must include expert testimony of a competent witness," RSA 507-E:2, I, of the standard of reasonable care, breach thereof and proximate causation of damages, *see* RSA 507-E:2, I(a)-(c).

In *Gust*, a case we relied upon in *DeBenedetto*, defendants in a vehicle accident action sought to apportion fault to a nonparty doctor, *Gust*, 162 F.3d at 593, after the plaintiff sought recovery for harm to his femur, foot and ankle, *id.* at 591. The Tenth Circuit applied Kansas law to require "adequate evidence" in support of "allegations that a nonparty's negligence caused a plaintiff's harm." *Id.* at 593. In the context of a medical negligence claim "where the lack of reasonable care would [not] be apparent to the average layman," *id.*, such adequate evidence "require[d] expert testimony to establish that the [nonparty doctor breached] the accepted standard of medical care." *Id.* at 593-94. The lack of such expert testimony with respect to the treatment of the plaintiff's femur precluded apportionment to the nonparty doctor. *Id.* at 594. Although some evidence suggested a breach of care regarding treatment of the plaintiff's foot and ankle, those claims were also properly excluded from jury apportionment where the "[d]efendants produced no expert testimony that [the doctor's] treatment exacerbated [the plaintiff's] foot and ankle injuries or resulted in any harm to [the plaintiff.]" *Id.*

Dr. Kleeman's reliance upon the First Circuit's holding in *Wilder* is misplaced. Notably, it preceded our decision in *Nilsson* by over ten years. Moreover, it is distinguishable from the case before us today. *Wilder* stands for the proposition that the plaintiff must prove proximate causation of his or her injuries, *Wilder*, 977 F.2d at 676, while "the defendant need not disprove causation" but only "discredit or rebut the plaintiff's evidence," *id.* "Defendant need not prove another cause, he only has to convince the trier of fact that the alleged negligence was not the legal cause of the injury." *Id.* Here, unlike *Wilder*, the defendant *is* seeking to prove another cause and, so, must go beyond the mere rebuttal of the plaintiff's expert evidence in *Wilder*.

█ After reviewing the record, we conclude that there was sufficient expert testimony adduced to support the jury's apportionment of fault to Drs. Nepomnayshy and Mahon. As for Dr. Nepomnayshy's fault, Drs. Kleeman and Regan both testified that vascular issues were the vascular surgeon's responsibility. Dr. Morgan testified that Dr. Nepomnayshy would have been directing Dr. Kleeman in accessing Goudreault's spine. Dr. Golding opined that vascular injuries in such an approach were rare and that Goudreault's four injuries were *per se* breaches of the standard of reasonable care. Even Dr. Morgan conceded that it is unusual to have four vascular injuries during an ALIF. At minimum, the jury could have reasonably found that the vascular injuries caused Goudreault to endure additional surgeries and prolonged hospitalization.

As for Dr. Mahon, he was present for the repair of Goudreault's vascular injuries. Dr. Morgan testified that Goudreault's compartment syndrome was likely the product of procedures to repair the vascular injuries coupled with the excess of fluid in Goudreault's system following surgery. Dr. Morgan testified that the vascular surgeons, including Dr. Mahon, were responsible for post-surgical monitoring of vascular issues. Both Dr. Kleeman and the ICU nurse testified to alerting Dr. Mahon of Goudreault's suspected compartment syndrome. Dr. Kleeman acknowledged that Dr. Mahon did not act quickly and that several hours elapsed before Goudreault's surgery began. Dr. Golding also testified that any surgeon would know that vascular injury was a common cause of compartment syndrome and that time was of the essence in averting permanent injury. He also testified that the failure to timely diagnose and treat the compartment syndrome caused permanent injuries. We conclude that there was ample evidence supporting the jury's verdict as to Dr. Mahon.

*Reversed and remanded.*

BRODERICK, C.J., and DUGGAN and GALWAY, JJ., concurred.