NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2021-0350

THE STATE OF NEW HAMPSHIRE

v.

IAN BOUDREAU

Argued: February 9, 2023
Opinion Issued: June 7, 2023

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Audriana Mekula, attorney, on the brief and orally), for the State.

Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.

DONOVAN, J. The defendant, Ian Boudreau, appeals his convictions, following a jury trial before the Superior Court (Wageling, J.), on fourteen counts of aggravated felonious sexual assault (AFSA). See RSA 632-A:2 (Supp. 2022). He argues that the trial court erred by: (1) improperly responding to a jury question during its deliberation concerning the State's burden of proof; and (2) allowing the State to introduce evidence in its case-in-chief of the defendant's pre-arrest refusal to speak to the police. We conclude that the trial court sustainably exercised its discretion in responding to the jury question.

We further conclude that the trial court erred in admitting evidence of the defendant's pre-arrest silence in the State's case-in-chief, but that any error was harmless beyond a reasonable doubt. Accordingly, we affirm.

## I. Facts

The jury could have found the following facts. The defendant has two children with his ex-wife, a daughter, E.B., and a son, T.B. After the couple divorced, the children lived with their mother and visited the defendant at his residence every other weekend. After his divorce, the defendant met and subsequently began a romantic relationship with P.C. Around 2007, the defendant moved into P.C.'s two-bedroom apartment with her two young daughters, A.P. and S.P. Approximately one year later, when A.P. was six years old and S.P. was three years old, the defendant, P.C., and the two girls moved into a different two-bedroom apartment. There, the defendant and P.C. shared one bedroom, and A.P. and S.P. shared the other bedroom. When E.B. visited the defendant at the apartment, she slept on the floor of the bedroom that A.P. and S.P. shared. In 2012, P.C. gave birth to a son, J.B., fathered by the defendant. After J.B.'s birth, he and T.B. (when present) shared the bedroom formerly occupied by the defendant and P.C., who then slept on a sofa in the living room.

On April 11, 2019, E.B. told her mother that the defendant had sexually assaulted her. Her mother informed the local police department of her daughter's disclosure and expressed concern for A.P. and S.P. Thereafter, the police spoke with P.C. and asked her if she believed that the defendant was sexually assaulting her daughters. P.C. responded that she believed it to be true and that "it wasn't the first time [she] had suspected it." The police then went to the apartment and spoke with S.P., who also disclosed that the defendant had sexually assaulted her. Following S.P.'s disclosure, A.P. disclosed that the defendant had sexually assaulted her as well.

On April 15, 2019, E.B., A.P., and S.P. were interviewed at a Child Advocacy Center (CAC). The following day, the police obtained an arrest warrant for the defendant, who later that day "showed up" in the police station lobby to collect some paperwork. Prior to informing the defendant of his arrest, two officers approached the defendant and asked him if he was willing to provide a statement. After the defendant "declined," the officers arrested him. Thereafter, a grand jury indicted the defendant on fourteen counts of AFSA committed against E.B., A.P., and S.P. Eight of the charges alleged pattern offenses, and six of the charges alleged single incidents of AFSA.[1]

---

[1] A grand jury also indicted the defendant on five counts of possession of child sexual abuse images (CSAI). The jury acquitted the defendant on all five CSAI charges. As a result, this opinion omits the evidence related to those charges, as the evidence is unnecessary to resolve this appeal.

2

All three minor victims testified at trial. A.P. testified that the first sexual assault occurred when she was six years old and continued regularly thereafter for the next ten years until law enforcement became involved. She informed the jury that the defendant initiated the sexual assaults by asking her to "lay with" him, which A.P. understood to be the defendant's code word for sex, and that if she refused, he threatened to take away her phone. She testified that the sexual assaults generally occurred as often as four times a week and whenever she was alone at the apartment with the defendant. A.P. also testified that the assaults typically concluded with the defendant ejaculating onto her bedsheets. In addition, A.P. described sexual assaults that occurred while she was sleeping in the same bedroom with her sister, S.P., who was asleep.

For her part, S.P. testified to substantially similar conduct by the defendant. S.P. testified that the sexual assaults began when she was nine, and increased in frequency until the defendant's arrest. She testified that the assaults occurred "every other day" when she was alone with the defendant in the apartment, with the last sexual assault occurring two days prior to her disclosure to the police. She revealed that, in one instance, the sexual assault ended with the defendant ejaculating onto her bedsheets. She also described the defendant telling her that she needed to "lay with" him, a reference she understood to mean "having sex with him," either to receive gifts or to avoid punishments.

E.B. testified that the first sexual assault occurred when she was six and continued about every other time she visited the apartment from fourth grade until her eighth grade school year. Generally, the sexual assaults occurred at night after E.B. went to bed, either when she was sleeping in the bedroom alone, or when both A.P. and S.P. were sleeping in the bedroom with her.

One of E.B.'s friends and E.B.'s boyfriend also testified at trial. The friend testified that, when E.B. was approximately eleven or twelve years old, she disclosed that the defendant "was touching inappropriate areas" and that E.B. was scared to visit the apartment. Later, about six or seven months prior to her disclosure to her mother, E.B. told the friend that her "dad has been raping [her]." In response, the friend told E.B. to threaten the defendant and E.B. sent a message to the defendant telling him that if he ever touched her again, she would tell her mother. After this message, the defendant's sexual advances stopped for a "long time," until the defendant asked E.B. to "lay down with me" as a birthday present, but she refused to do so. E.B. testified that when the defendant asked her to "lay with" him she understood that he was asking for sexual intercourse, which he often attached to gifts. Two days prior to her disclosure to her mother, E.B. informed her boyfriend of the sexual assaults. The boyfriend told E.B. to tell her mother right away, or else he would do so.

Each victim testified that she never observed the defendant sexually assaulting the other victims. However, the defendant's son, T.B., testified that, on one occasion in 2019 during a visit to the apartment, he left his room at night and witnessed A.P. and the defendant engaging in sexual intercourse.

During the course of the investigation of the victims' allegations, the police collected bedding from the apartment. At trial, a serologist employed by the New Hampshire State Police Forensic Laboratory testified that bedding taken from S.P.'s bed contained semen stains with a rare DNA profile matching the defendant's DNA profile within a statistical probability of "1 in 390 billion people."

At trial, the defendant testified and denied sexually assaulting the three victims. The defendant explained that his relationship with P.C. at the time of the victims' disclosures was "[n]ot good at all" and that P.C. would regularly accuse him of being a "pedophile in front of [his] kids." He also testified that he often slept in the children's beds when tired from his irregular working hours, and that sometimes he became sexually aroused while sleeping. In its closing, the defense hypothesized that the defendant may have "had an emission in his sleep," which explained the semen on one of the victim's bedsheets. The defense also focused on the defendant's denial of the underlying conduct throughout the criminal investigation, argued that P.C.'s accusations may have planted the idea in the victims' heads leading to their contrived allegations, and stressed the implausibility of the separate victims never observing the defendant's conduct, despite their testimony that the defendant often committed sexual assaults against one victim while the other victims were asleep in the same room.

Following the nine-day trial, the jury convicted the defendant on all fourteen AFSA counts. The court sentenced the defendant to cumulative stand-committed terms totaling 60 to 120 years. This appeal followed.

## II. Analysis

### A. Jury Question

The defendant first argues that the trial court erred in answering a question posed by the jury during its deliberation. The jury sent the judge two questions relevant to this appeal. The first question asked, "Please define [r]easonable doubt to non[-]legal people and somehow quantify reasonable doubt?" The court responded by providing its original jury instruction defining reasonable doubt and directing the jury to consider that definition. The court added that this court has "provided [trial courts] with this definition of the term 'reasonable doubt' with instruction to not veer from it when instructing a jury." However, the judge clarified "that there is no number or percentage to be assigned to the concept of 'reasonable doubt.'"

4

Thereafter, the jury followed up with another question concerning the State's burden of proof: "If you believe it's more than likely then [sic] not that the Defendent [sic] commited [sic] accused crimes, Is that worthy of a Guilty verdict?" Overruling the defendant's request for a direct answer, the court responded that "[t]he burden of proof in this case is proof beyond a reasonable doubt. I have provided you with that definition. You must apply that standard in reaching your verdict on each charge." The defendant asserts, and the State does not dispute, that the jury did not ask any further questions and approximately an hour later announced its verdicts.

"The response to a jury question is left to the sound discretion of the trial court." Goudreault v. Kleeman, 158 N.H. 236, 250 (2009) (quotation omitted). "[W]e review the court's response under the unsustainable exercise of discretion standard." Id. (quotation omitted). "We review the trial court's answer to a jury inquiry in the context of the court's entire charge to determine whether the answer accurately conveys the law on the question and whether the charge as a whole fairly covered the issues and law in the case." Id. (quotation omitted).

Here, the defendant argues that the court erred in its response to the jury's second question. Specifically, the defendant argues that the court's response "merely referred the jury again to the standard instruction [and] failed to answer the question." In his view, "[b]y failing to give a direct answer to the question, the court left the jury in doubt about a principle that should have been explained unambiguously." He further argues that because the court's response was, in effect, no response at all, this case is analogous to our holding in Goudreault v. Kleeman, 158 N.H. 236 (2009), and we must reverse as we did in that case. We disagree.

In Goudreault, we concluded that the jury question at issue was open to two reasonable interpretations and that, although the court's answer addressed one interpretation, it ignored the other. Id. at 250-51. Accordingly, we held that the court's response was akin to "no response at all" and reversed. Id. at 251 (quotation omitted). Here, we do not perceive any ambiguity in the jury's question, nor can we conclude that the court's answer ignored another reasonable interpretation of the question. Instead, like the trial court, we construe the jury's question as a straightforward inquiry as to whether the standard of "more likely than not" was sufficient for the jury to issue a guilty verdict. The court responded by instructing the jurors that they could consider only the definition of reasonable doubt provided in the original jury instructions. The court's response included no reference to the term "more likely than not."

We disagree with the defendant that the court's declination to provide a direct response in effect equates to no response at all. Rather, we conclude that a reasonable juror would have understood that reiterating the applicable

5

standard, which did not include the term "more likely than not," meant that the "more likely than not" standard was not to be considered in reaching a verdict.  State v. Dingman, 144 N.H. 113, 115 (1999) ("The instruction must be judged as a reasonable juror would probably have understood it . . . ." (quotation omitted)).

Moreover, we sympathize with the trial court's concern about a protracted back and forth with the jury over the meaning of a term not included in the jury instructions concerning the State's burden of proof.  Any such discussion may have caused additional confusion for the jury as to the applicable law.  In responding to the jury question, the trial court accurately informed the jury of the applicable standard of proof to be applied to the evidence submitted at trial.  Consequently, we cannot conclude that, by doing so, the trial court somehow misled the jury as to the applicable law.  See Goudreault, 158 N.H. at 250 ("First, [the party challenging an instruction] must show that it was a substantial error such that it could have misled the jury regarding the applicable law." (quotation omitted)).  Accordingly, we conclude that the trial court sustainably exercised its discretion in responding to the jury question concerning the State's burden of proof.

B. Admission of Pre-Arrest Statements

The defendant next argues that the trial court erred in allowing the State to introduce, in its case-in-chief, evidence of his pre-arrest refusal to answer police questions or to provide a statement.  At trial, the State elicited testimony from two officers concerning the defendant's statements just prior to his arrest.  The first officer testified that he asked the defendant "if he was willing to provide an interview, a statement, regarding what's been going [on] these last few days."  At that point, the defense objected, first citing hearsay and then arguing that the officer "shouldn't be testifying about [the defendant] declining to make a statement" because it is prejudicial.  The State countered that the proposed line of questioning only included admitting the defendant's uncontroverted statements that he made prior to his arrest and receipt of Miranda warnings, see Miranda v. Arizona, 384 U.S. 436, 478-79 (1996), and assured the court that it would not elicit any testimony about his post-arrest statements "as that would be unconstitutional."  The court overruled the defendant's objection, finding the evidence to be "clearly probative," and allowed the State to introduce the statements that the defendant made prior to his arrest and prior to receiving his Miranda warnings.

Thereafter, the officer testified that in response to his question, the defendant indicated that "[h]e did not want to talk to us" and "did not want to provide a statement."  Later, the State elicited testimony from the other officer who also spoke with the defendant just prior to his arrest.  The officer recounted a similar interaction with the defendant, stating, "essentially, [I] asked him that, we didn't have his side of the story yet, we'd really like to talk

6

to him, if he wanted to come into the police department for an interview." The officer testified that the defendant "declined," and "said he just wanted to gather the paperwork that he wanted to pick up and . . . just go." In its closing, the State referenced the testimony of the officers, noting that the defendant "declined" to make a statement and instead waited until after he listened to all the evidence introduced during the trial to provide his version of events.

On appeal, the defendant argues that admission of his pre-arrest statements violated his privilege against self-incrimination protected under the Fifth Amendment to the Federal Constitution. See U.S. CONST. amend. V. In State v. Remick, 149 N.H. 745 (2003), we held that "[w]hile use of pre-arrest silence to impeach a defendant's credibility is not unconstitutional, use of pre-arrest silence in the State's case-in-chief, in which the defendant does not testify, is unconstitutional." Remick, 149 N.H. at 747. Based upon this language, the defendant argues that the trial court erred by allowing the State to introduce evidence of his pre-arrest silence in its case-in-chief. Further, the defendant notes that, although he testified, during its cross-examination of the defendant, the State did not inquire about his pre-arrest statements or use those statements to impeach his credibility. In his view, the erroneous admission of his pre-arrest silence as direct evidence of his guilt prejudiced him by "supplying what jurors [would] likely perceive as the equivalent of a confession in a case in which the State did not have evidence of an actual confession."

As an initial matter, the State contends that the defendant failed to preserve his Fifth Amendment argument for appeal. Specifically, the State argues that the defendant's objection was limited to New Hampshire Rule of Evidence 403, challenging only that the evidence was more prejudicial than probative. The State maintains that the defendant never articulated a Fifth Amendment objection, and thus, the trial court never considered whether the defendant's pre-arrest declination to make a statement constituted an unambiguous invocation of his right to remain silent. We are unpersuaded. "We have often explained that the purpose of our preservation rule is to ensure that trial courts have an opportunity to rule on issues and to correct errors before parties seek appellate review." State v. Perez, 173 N.H. 251, 258 (2020). "With these principles in mind, we have held that an issue is preserved when the trial court understood and therefore addressed the substance of an objection." Id.

Here, although defense counsel objected to the evidence as being unfairly prejudicial with no probative value, the State expanded the question before the trial court by arguing that constitutional protections applied only to the defendant's post-arrest statements. Specifically, the State conceded that admission of the defendant's similar declination, post-arrest, to provide the police with a statement "would be unconstitutional." However, the State

7

argued that because it intended to limit its inquiry to the defendant's pre-arrest and pre-Miranda statements, it could "see no reason why it shouldn't be allowed in." In response, the court overruled the defendant's objection and instructed the State to limit its inquiry to the defendant's pre-Miranda statements. Therefore, based upon the substance of the State's argument and the trial court's final ruling, we conclude that the trial court considered how constitutional protections, which implicitly included the protections of the Fifth Amendment, applied to his pre-arrest as well as his post-arrest statements. Accordingly, the defendant's Fifth Amendment argument is preserved for our review.

Next, the State asserts that the defendant's argument is without merit because the defendant's statements do not evince that he expressly invoked his Fifth Amendment right to remain silent. See State v. Pouliot, 174 N.H. 15, 20 (2021) ("The United States Supreme Court has held that, even when a person is not in custody and does not receive Miranda warnings, in order to benefit from the Fifth Amendment privilege against compelled self-incrimination, the person must 'expressly invoke the privilege.'"). We are unpersuaded.

When asked whether he wanted to provide a statement to the police, the defendant unequivocally responded that "[h]e did not want to talk to [the police]." Both this court and the United States Supreme Court have held that when a defendant states that he or she does not "want to speak with the police," he or she has sufficiently invoked his or her right to remain silent. Cf. State v. Watson, 170 N.H. 720, 727 (2018) ("The defendant neither said that he wanted to remain silent nor that he did not want to speak with the police. 'Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning.'" (quoting Berghuis v. Thompkins, 560 U.S. 370, 382 (2010))). Accordingly, we conclude that the defendant expressly invoked the protections of the Fifth Amendment.

The State further argues that, even if the defendant invoked his right to remain silent, the State nevertheless "used the defendant's pre-arrest declination for impeachment purposes." The State concedes that it did not impeach the defendant with his pre-arrest silence during its cross-examination of the defendant. However, the State argues that it did cross-examine the defendant concerning his preparation for his testimony at trial, including his review of police reports, victim interviews, and witness statements. In its closing argument, the State referenced the defendant's pre-arrest silence and compared that evidence to its cross-examination of the defendant's trial preparation. Therefore, in the State's view, because it eventually used evidence of the defendant's pre-arrest silence to impeach his credibility, no violation of the defendant's Fifth Amendment rights occurred.

Regardless, the trial court permitted the State to introduce the defendant's pre-arrest silence in its case-in-chief. At that point, admission of

8

the defendant's pre-arrest silence as evidence of his guilt violated his Fifth Amendment privilege against self-incrimination. See Remick, 149 N.H. at 747. In State v. Reid, 161 N.H. 569, 576 (2011), we reaffirmed Remick by observing that a "defendant's pre-arrest silence may be used to impeach his credibility, but the use of pre-arrest silence in the State's case-in-chief is unconstitutional."

Because a defendant's decision to testify is left solely to the defendant, neither the parties nor the trial court can know with any certainty whether a defendant will testify on his or her own behalf until the State has concluded its case-in-chief. In fact, that decision is often directly reliant on the strength or weakness of the State's evidence and trial performance. Accordingly, whether a defendant's pre-arrest silence is admissible for any purpose, it cannot be admitted in the State's case-in-chief. Id. For these reasons, whether the defendant testified in this case or the State subsequently referenced the defendant's pre-arrest silence to impeach his credibility in its closing argument is immaterial to determining whether the initial admissibility of this evidence during the State's case-in-chief was proper. As a result, we conclude that the trial court erred in admitting evidence of the defendant's pre-arrest silence during the State's case-in-chief.

C. Harmless Error

The State argues that any error was harmless beyond a reasonable doubt. In the wake of our decision in State v. Racette, 175 N.H. 132 (2022), both the State and defense counsel, the Office of the Appellate Defender, urge the court to distill our harmless error jurisprudence and simplify our harmless error standard by adopting a totality of the circumstances test. We agree to do so. In fact, a canvass of our harmless error jurisprudence supports a formulation of the standard that considers a non-exhaustive list of factors to determine whether the State has proven beyond a reasonable doubt that the identified error did not affect the verdict. This standard more accurately captures the harmless error analyses that we have applied for decades. Accordingly, we conclude that the harmless error standard is more accurately stated as a totality of the circumstances analysis, rather than a two-pronged, disjunctive test tethered to specific labels that may have different meanings in different contexts.

Therefore, to establish harmless error, "the State must prove beyond a reasonable doubt that the error did not affect the verdicts." State v. Papillon, 173 N.H. 13, 28 (2020). This standard applies to both the erroneous admission and exclusion of evidence. Id. "[W]e consider the alternative evidence presented at trial as well as the character of the erroneously admitted evidence itself." Id. at 29. To determine whether the State has proven beyond a reasonable doubt that an error did not affect the verdict, we must evaluate the totality of the circumstances at trial. See State v. Woodbury, 124 N.H. 218,

9

221 (1983) ("[W]e must also consider the State's argument that the admission of his testimony, in light of all the existing circumstances, constituted harmless error."); cf. Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986) ("Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts."); State v. Cooper, 168 N.H. 161, 165 (2015) (citing Delaware, 475 U.S. at 684).

The factors that we have considered in assessing whether an error did not affect the verdict include, but are not limited to: (1) the strength of the State's case, see State v. Vandebogart, 139 N.H. 145, 158 (1994); (2) whether the admitted or excluded evidence is cumulative or inconsequential in relation to the strength of the State's case, see State v. Lemieux, 136 N.H. 329, 331-32 (1992); (3) the frequency of the error, see State v. Bujnowski, 130 N.H. 1, 5-6 (1987); (4) the presence or absence of evidence corroborating or contradicting the erroneously admitted or excluded evidence, see State v. Pennock, 168 N.H. 294, 306 (2015); (5) the nature of the defense, see State v. Brown, 128 N.H. 606, 611 (1986); (6) the circumstances in which the evidence was introduced at trial, see State v. Thibedau, 142 N.H. 325, 330 (1997); (7) whether the court took any curative steps, see State v. Munson, 126 N.H. 191, 193 (1985); (8) whether the evidence is of an inflammatory nature, see State v. Dumais, 126 N.H. 532, 535 (1985); and (9) whether the other evidence of the defendant's guilt is of an overwhelming nature, see id. No one factor is dispositive. This court may consider factors not listed above, and not all factors may be implicated in a given case.

Our harmless error analysis has frequently applied various factors to determine whether the erroneous admission or exclusion of evidence was harmless, many of which do not clearly fall within the terms "overwhelming nature, quantity, or weight," "merely cumulative," or "inconsequential." It is evident that we have always applied a totality of the circumstances approach to this analysis and historically we have not applied the harmless error standard as requiring the State to prove all of the factors in the standard beyond a reasonable doubt, nor have we treated the standard as automatically satisfied when the State meets its burden of proving just a single factor. Formally adopting a totality of the circumstances approach to harmless error does not fundamentally change the nature or application of the analysis this court has traditionally employed and is more consistent with our historical approach to evaluating and resolving claims of harmless error.[2]

---

[2] Adopting a totality of the circumstances test with respect to the harmless error standard is also consistent with the analysis employed by many other states. See, e.g., State v. McBreairty, 137 A.3d 1012, 1019-1020 (Me. 2016) (assessing whether a prosecutor's misstatement at trial was harmless error based on the totality of the circumstances); State v. Harris, 745 N.W.2d 397, 408-09 (Wis. 2008) (employing the totality of the circumstances to determine harmless error); State v. Oscarson, 845 A.2d 337, 348-49 (Vt. 2004) (employing a list of factors to determine whether an error is harmless beyond a reasonable doubt); State v. Carter, 674 A.2d 1258, 1265-66 (Vt. 1996) (formally adopting a factor-based totality of the

Here, the alternative evidence of the defendant's guilt was overwhelming. All three victims provided direct testimony of the defendant's repeated sexual assaults spanning multiple years. See RSA 632-A:6, I (Supp. 2022) ("The testimony of the victim shall not be required to be corroborated in prosecutions under this chapter."). The three victims testified consistently with one another as to the defendant's repeated conduct, including that the defendant referred to the sexual assaults as "laying with" him, and that the defendant induced them to submit to the sexual assaults with rewards or threats of punishments. At no point during its cross-examination of the victims did the defense impeach the victims' credibility with prior inconsistent statements related to the alleged AFSA charges. Indeed, two medical providers testified to the victims' descriptions of the sexual assaults following their CAC interviews, which remained consistent with the victims' testimony at trial, nearly two years later.

The State also produced an eyewitness, the defendant's son, who testified that he witnessed the defendant and one of the victims engaging in sexual intercourse. The State further corroborated the victims' testimony with evidence that one victim's bedsheet contained semen with a rare DNA profile that matched the defendant's DNA profile within a statistical probability of "1 in 390 billion people." This undisputed evidence corroborated the testimony that the defendant typically ended the assaults by ejaculating on the bedsheets. Additionally, E.B.'s friend testified that, on two separate occasions within the three years preceding the police investigation, E.B. disclosed the defendant's conduct to her and that E.B. told her that "she didn't feel safe with her dad." Following E.B.'s disclosure, the friend testified that, when E.B. had visitation with the defendant, E.B. would occasionally text her stating that she was nervous, and that, when E.B. described the sexual assaults to her in detail, E.B. became very emotional and began to shake. Against this record, the inadmissible evidence of the defendant's pre-arrest refusal to speak with the police was of little consequence.

The defendant's concern that the prejudice caused by the admission of this evidence could have led the jury to construe the defendant's pre-arrest silence as a "quasi-confession" was mitigated by the defendant's testimony and his denial of the allegations asserted by the victims. Moreover, evidence of the defendant's pre-arrest silence comprised a "small portion" of the State's case-in-chief, as well as its closing argument, and the inadmissible evidence was not

---

circumstances approach to harmless error). Additionally, in Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986), the United States Supreme Court held that a defendant's denial of an opportunity to impeach a witness at trial "is subject to [a] harmless-error analysis." The Court further held that "[w]hether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id.

"lengthy, comprehensive, or directly linked to a determination of the guilt or innocence of the defendant."  <u>Thibedau</u>, 142 N.H. at 330 (quotation omitted). Therefore, we conclude that, based upon the totality of the circumstances, the trial court's error in admitting evidence of the defendant's pre-arrest silence did not affect the verdict and thus was harmless beyond a reasonable doubt.

<u>Affirmed</u>.

MACDONALD, C.J., and HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.